FLOYD MCKINSTRY *et al.* Appellants, *vs.* ARTHUR E. PRICE *et al.* Appellees.

*Opinion filed June 16, 1914.*

1. WILLS—*codicil will be held to revoke will only when necessary.* Courts will endeavor to construe a codicil so as to reconcile it with the will as far as possible, and the codicil will be held to revoke the will only when necessary to give effect to the provisions of the codicil.

2. SAME—*what provision of will must be regarded as revoked by codicil.* A provision of a will requiring the executor to have full control of certain devised land until an existing encumbrance thereon is paid from the rents and profits must be regarded as revoked by the provision of a codicil giving the land to the executor in trust, to sell and convey the same when he shall deem it for the best interest of the estate to do so.

3. TRUSTS—*when purchaser of trust property is not required to see to application of purchase money.* The purchaser of land from a trustee is not required to see that the money is applied to the purposes of the trust even though he knew the land was trust estate, where the beneficiaries, who were all of age and under no disability, and without any fraud being practiced upon them, executed quit-claim deeds to the trustee to enable him to make the sale.

4. ESTOPPEL—*when beneficiaries are estopped to set aside sale because the trustee has not accounted to them.* Beneficiaries who are all of age and under no disability, and who execute quit-claim deeds to the trustee of the land in order to enable him to sell the land, and who later, after the purchaser has been in possession of the land for almost a year, execute quit-claim deeds to him, without any fraud on his part, in order to enable him to obtain a loan on the land, are estopped to have the sale set aside on the ground that the trustee has not accounted to them for the purchase money.

APPEAL from the Circuit Court of Kankakee county; the Hon. DORRANCE DIBELL, Judge, presiding.

W. R. HUNTER, and WALTER C. SCHNEIDER, for appellants.

H. K. & H. H. WHEELER, and DEFREES, BUCKINGHAM & EATON, for appellees.

Mr. JUSTICE FARMER delivered the opinion of the court:.

Appellants, three of whom are grand-daughters of John Bennett, deceased, and daughters of George M. Bennett, executor and trustee under the will of John Bennett, and the husbands of the two who are married, filed their bill to the May term, 1912, of the Kankakee county· circuit court, asking for the rescission of a· sale of real estate by George M. Bennett, as trustee, to Arthur E. Price and Edward C. Curtis, on July 30, 1908, who, together with George M. Bennett, were made parties defendant. Other parties were made defendants to the bill but no relief was asked as to them. The bill sets out, in substance, the will of John Bennett, deceased, which will be more fully referred to hereafter, and alleged that in the year 1906 George M. Bennett became heavily indebted to the Grant Park National Bank, of which appellee Curtis was a stockholder and the cashier; that at the suggestion of Curtis a number of persons gave the bank their accommodation notes to take the place of Bennett's notes, and Bennett gave said persons his notes in equal amounts; that among such persons giving such accommodation notes for Bennett were appellee Arthur Price and his brother, David Price; that each of them gave their notes to the bank for $5000 and took from Bennett his notes in equal amounts, indorsed by Curtis. The Grant Park Trust and Savings Bank succeeded the Grant Park National Bank and became the owner of its assets, including the accommodation notes referred to. The bill alleges that while said notes were so held by the bank, Arthur Price, Curtis and George M. Bennett fraudulently conspired and agreed that Price should purchase from Bennett, as trustee, the land described in the sixth, seventh and eighth paragraphs of the will of John Bennett, and that said Price did thereafter purchase said land; that a part of the consideration agreed upon was the $10,000 of Bennett's indebtedness to the bank for which it held the accommodation

notes of Arthur Price and David Price, and that the said
conspiracy was carried out. The bill alleges that no other
consideration was paid for the land by Price than the can-
cellation of Bennett's indebtedness to the bank, but it is
not now claimed the proof sustained that allegation. It is
claimed that $10,000 of Bennett's indebtedness to the bank
for which the bank held accommodation notes of the Prices
was canceled and satisfied as a part of the consideration
for the sale of the land, and that when these notes were
surrendered to the Prices they delivered up the notes of
Bennett held by them and which were indorsed by Curtis.
The bill further alleges that Price knew appellants had an
interest in the land, and that he, Bennett and Curtis con-
spired to defraud them, and that they were ignorant of the
said conspiracy; that during the spring or summer of 1908
George M. Bennett, conspiring with Price and Curtis to de-
ceive and defraud appellants, represented to them that it
was necessary for them to execute a quit-claim deed for
the land to Bennett to enable him to give a perfect title
when he sold the land in accordance with the terms of the
will, and appellants were thereby induced to execute and
deliver to Bennett quit-claim deeds; that at that time ap-
pellants were ignorant of the fact that Bennett had con-
tracted for the sale of the land to Price. The bill further
alleges that March 29, 1909, David Price, at the request and
on behalf of Arthur Price, and pursuant to their fraudulent
schemes, represented that Arthur Price was the *bona fide*
owner of the lands; that he was desirous of making a loan
thereon, and that the person from whom he was getting the
loan required a deed to him from the heirs and devisees of
John Bennett, and relying upon these representations they
were induced to, and did, execute a quit-claim deed to Price.
The bill set out encumbrances placed on the land after the
sale to Price, and alleged the conveyance by George M.
Bennett to Price was made with full knowledge of and in
fraud of appellants' rights; that they have never received

any part of the proceeds of the sale nor has the trustee ever paid them anything whatever upon their claims and interests as beneficiaries in the fund, and that said trustee is now insolvent. The bill prayed that the deed made by George M. Bennett, trustee and executor, to Arthur E. Price, and the quit-claim deeds from appellants to George M. Bennett, trustee, and to Arthur Price, respectively, be set aside and declared void as against appellants; that Bennett be required to account to appellants as executor and trustee; that he be removed and some suitable person be appointed trustee to sell the lands and distribute the proceeds, and that Curtis and Arthur Price be required to pay and discharge certain encumbrances on the land.

Appellees answered, denying fraud and conspiracy in the purchase and sale of the land; denied Bennett had not accounted; denied that the accommodation notes entered into the sale, and relied upon ratification, *laches* and the quit-claim deeds of appellants. They also denied that the deed should be set aside or present encumbrances against the land be decreed to be discharged by appellees Price and Curtis.

The cause was heard by the chancellor, who dismissed the bill for want of equity and at appellants' costs, except as to appellee George M. Bennett, trustee. As to such trustee the court found he had sold the land devised to him in trust, for $31,130; that he had failed to make provision out of such sum for annuities; that he had not accounted to appellants for the proceeds of the sale nor the income from the land prior to such sale, and that he had been guilty of a breach of trust. The decree further found Bennett's settlement with the annuitants and legatees out of private funds belonging to the trustee, except as to the settlement with Nellie Bennett, the widow of John Bennett, were advantageous to appellants and that he is entitled to credit therefor; that Bennett, as trustee, out of funds belonging to him individually, had satisfied the legacies and an-

nuities provided in the will, leaving him owing the estate $26,553.30; that Bennett in open court had waived in fa-. vor of appellants his right in a $12,000 lien on individual land he had sold, which, together with other land owned by him and valued at $7000, also turned over to the estate of John Bennett, deceased, entitled him, as trustee, to a credit of $19,000 on said $26,553.30 indebtedness. The court further found Bennett had been derelict as trustee and that he was insolvent, and removed him and appointed appellant McKinstry as trustee. Further orders and findings of the court not necessary to be here reviewed were recited in the decree. Complainants in the bill have prosecuted this appeal from that decree.

That appellants never have received from George M. Bennett any of the proceeds of the sale of the real estate is not in dispute. It is earnestly contended by appellants that there was fraud and collusion between Bennett and appellees Arthur Price and Curtis in the sale of the land. The Grant Park National Bank, of which Curtis was a stockholder and the cashier, held Bennett's notes for more than $20,000, which, as we understand the evidence, were unsecured. This became unsatisfactory to the bank authorities, and $10,000 of the indebtedness was adjusted by Arthur Price and David Price each giving the bank their accommodation notes for $5000. Bennett then gave each of the Prices his notes for $5000, which were indorsed by Curtis. Appellants contend that the sale of the farm to Price was in part for the purpose of paying this $10,000, and that Curtis first made the proposition to Bennett that he sell the land. Bennett at first objected to selling, but Curtis proposed Arthur Price as a purchaser, and the terms of sale as finally agreed upon were that the $10,000 indebtedness mentioned was to be a part of the consideration. The sale included twelve acres of land belonging to Bennett, and the price agreed to be paid was $110 per acre, or

$32,450. Of that sum $31,130 was for the lands held by Bennett as trustee.

The contention of appellants that the $10,000 of Bennett's indebtedness was part of the consideration for the sale was not sustained by the circuit court. Upon this question the evidence was conflicting. There is no dispute that $20,000 of the consideration was to be paid by Price assuming a mortgage of $5000 to Caulkins, placed on the land by John Bennett in his lifetime, and giving his notes for $15,000, secured by a second mortgage on the land. Price testified he did not know at the time he contracted to purchase the land that appellants had any interest in the funds arising from the sale, but when he learned, from the abstract furnished, the character of Bennett's title, a written contract was entered into between him and Bennett. That instrument is dated March 28, 1908, and recites that a verbal contract had been theretofore entered into between the parties for the sale of the land by Bennett to Price for $110 per acre, but that Bennett was unable to make good title and desired a reasonable length of time to enable him to convey a good title; that Price was desirous of taking immediate possession of the land for the purpose of improving it, and it was therefore agreed that Price should deposit in the Farmers' State and Savings Bank, in mortgage notes and other securities, $9500, to be applied on the purchase price of the land, the securities to be held in escrow by the bank until Bennett made a good merchantable title, free of encumbrances; that then Price was to pay Bennett the remainder of the purchase price, with interest at five per cent from March 1, 1908. It was further agreed that Bennett was to proceed as rapidly as possible to make good title before January 1, 1909, and if he did not, the securities deposited in the Farmers' State and Savings Bank were to be returned to Price, and Bennett was to pay Price all sums he had expended on improvements, with six per cent interest, less the reasonable rental value of the land for

the time Price had the possession and use of it. Bennett secured quit-claim deeds from all the complainants to himself and releases from the annuitants, and afterwards, about the 30th of July, the deed from Bennett to Price was executed and the deal closed. It would unduly extend this opinion, without any corresponding benefit, to attempt to set out the mass of testimony of Bennett, the two Prices and Curtis as to what the consideration for the land was paid in. It seems quite clear the evidence upon this question did not sustain the allegations of the bill that the accommodation notes of the Prices for $10,000, given to the bank for the benefit of Bennett, furnished a part of the consideration. Bennett's own testimony is not clear and satisfactory, and in describing the cash and securities he received it is inconsistent with his claim that the Price notes were a part of the consideration. Adding them to what he admits he received in addition thereto, the sum would exceed the price paid for the land. Price and Curtis testified the Price notes did not form a part of the consideration for the sale of the land. The Arthur Price note to the bank for Bennett's accommodation was, he testified, paid a day or two after the deed was made, and when it was surrendered to him by the bank he surrendered Bennett's note. David Price testified he renewed his accommodation notes to the bank for Bennett on August 1, 1908, and they were not paid until 1910. The notes were produced on the trial and were stamped paid that year. The testimony of Price and Curtis in substance was that Price assumed the Caulkins mortgage of $5000 on the land, gave a second mortgage on it to Bennett to secure $15,000 in notes, and gave Bennett two checks, which had been cashed by Bennett and were introduced in evidence, amounting to $2810.67. August 3, 1908, Price gave Bennett another check for $104.15. He testified this was given to correct a mistake he and Bennett had made in figuring interest on the $9500 securities. This would make the total amount paid $32,414.82. The re-

mainder to make up the $32,450 was made up of accrued
interest on the securities turned over to Bennett. The cir-
cuit court would not have been warranted in finding the
proof sustained the allegations of the bill that the Price
notes formed a part of the consideration for the sale of
the land. The proof shows the consideration paid was a
reasonable price for the land, and we think the weight of
it shows it was paid in cash and good securities, which were
satisfactory to and worth what they were taken for by Ben-
nett. In our opinion the proof did not sustain the alle-
gations of fraud and conspiracy charged against Bennett,
Arthur Price and Curtis.

It is contended by appellants that the trustee had no
power of sale until after he had paid the encumbrance out
of the rents and profits of the land. Whether George M.
Bennett, as trustee, had power to sell the land before the
encumbrance was paid depends upon the construction of the
ninth paragraph of the will and the third paragraph of the
codicil.

By his will John Bennett directed the payment to his
widow, so long as she remained unmarried, of $500 per
year. He also directed that so long as she remained un-
married she should have the use of the residence, but if
she vacated said premises she was to have an additional sum
of $100 per year, payable in monthly installments, so long
as she remained the testator's widow. This annuity was
made a charge against the real estate. By the sixth, seventh
and eighth paragraphs the testator devised to appellants cer-
tain real estate specifically described. The ninth paragraph
is as follows: "Whereas, a certain indebtedness exists as
against the tracts of land hereinbefore devised in the sixth,
seventh and eighth clauses of this will, I direct that my ex-
ecutor hereinafter named have full control of the rents and
profits of the said several tracts until he shall have paid
off the existing encumbrances from the rents and profits of
the same." By the tenth paragraph the testator devised to

Mary Schultz $50 per year during her life, which was made a charge against that portion of his estate devised to George M. Bennett. By the eleventh paragraph the testator devised his residuary estate to George M. Bennett, who was named executor in the will. Subsequently the testator made a codicil, by the first paragraph of which he gave to the Baptist church of Grant Park $200, annually, for five years next after his death. By the second paragraph he gave to the Union Corner's cemetery, near Grant Park, $50, annually, for the next five years succeeding his death. The third paragraph of the codicil is as follows: "The land mentioned in clauses 6, 7 and 8 I give and devise to my son, George M. Bennett, as trustee, for the following purposes: To sell and convey the same when he shall deem it for the best interests of the estate so to do, and from the proceeds of such sale or sales shall set aside and loan, upon unquestionable real estate security, a sufficient sum which at a low rate of interest will produce more than sufficient funds for the annuities hereinbefore in my said will and this codicil thereto specified to be paid, and the residue shall be distributed among the following persons: To my granddaughter Nellie B. Ferree and her husband, Dr. Ferree, one-third part; to my grand-daughter Georgia H. Bennett one-third part, and to my grand-daughter, Coralie B. McKinstry, and her husband, Floyd McKinstry, one-third part; and at the death of my wife, Nellie Bennett, then such fund remaining from the payment of annuities shall be divided into three equal parts and be distributed in like manner as the residue herein is distributed. Intending that the annuities herein provided shall be a lien on the real estate left by me and shall be paid first from the income or proceeds derived therefrom."

It will be seen the codicil makes no provision that the existing encumbrance be first paid out of the rents and profits before the land can be sold, but gives the trustee power and authority "to sell and convey the same when he

shall deem it for the best interests of the estate so to do."
A strong effort will be made to construe a codicil so as
to reconcile it with the will as far as possible, and the codi-
cil will be held to revoke the will only when necessary to
give effect to the provisions of the codicil. (Page on Wills,
sec. 269.) Construing the will and codicil together as one
instrument, as giving effect to the testator's intention, we
think the provision in paragraph 9 of the will requiring the
trustee to pay off an existing encumbrance on the land out
of the rents and profits derived from the land before sell-
ing the same must give way and be superseded by the later
provision found in the third paragraph of the codicil, giv-
ing the trustee power to sell when "he shall deem it for the
best interests of the estate so to do." It is not possible to
reconcile these provisions, and such being the case, the later
of the two must prevail. *Dickison* v. *Dickison,* 138 Ill. 541.

It is contended that Price, and Curtis, who was to get
one-half interest in the land, knew the land was trust prop-
erty; that they were bound to take notice of the scope of
the trustee's authority, and were bound to see that the pur-
chase money was applied to the proper discharge of the
trust. The proof shows Price and Curtis knew the land
was trust property, at least at the time the deed was made,
but in our opinion the proof in this record does not make
a case where the duty is imposed upon the purchaser to see
to the application of the purchase money to the proper dis-
charge of the trust. (*Dickson* v. *New York Biscuit Co.*
211 Ill. 468; *Seaverns* v. *Presbyterian Hospital,* 173 id.
414.) But even if the case were one in which the pur-
chaser from a trustee was bound to see to the proper ap-
plication of the money, the purchasers in this case were
relieved of that duty by the beneficiaries of the trust exe-
cuting quit-claim deeds. The beneficiaries were all of age
and under no disabilities. For the purpose of enabling
their father to consummate the sale, they at his request,
in May, 1908, executed to him quit-claim deeds. Before

that time the contract for the sale had been made between George M. Bennett and Price, and Price was in possession of the land. The claim that these deeds were procured by fraud is not sustained by the proof. After Price had received his deed and had paid for the land in the manner before stated, he wished to borrow $16,000 on the land to pay off existing encumbrances. The man he was negotiating with for the loan would not agree to let Price have that much money, secured by a mortgage on the land, unless appellants would make Price a quit-claim deed for the land. This they did March 29, 1909, at the request of Price, without any fraud being practiced upon them, so far as shown by the evidence. They knew the deeds they made to Bennett were desired by him for the purpose of enabling him to make the sale, and almost a year after the sale, and with knowledge the purchaser was in possession, they at his request made him a quit-claim deed. Even if their act in making the first quit-claim deeds would not estop them from asking that the sale be set aside on the ground that they did not know the trustee would not distribute the money to them, certainly their deed to Price would estop them, for they knew when that deed was made there had been no distribution to them of any part of the purchase money by their father, the trustee. It is apparent appellants were willing to release the land from liability to them and rely upon the trustee. While the quit-claim deeds to Bennett did not give him the power to sell the land, (he derived that power from the will,) Price and Curtis would not buy it unless appellants released the land from liability to them, and the sale would not have been made but for appellants' act in making the quit-claim deeds. The quit-claim deeds are, in our judgment, as effective to estop appellants as receipts for their respective shares of the trust fund would have been. No fraud or collusion on the part of the purchasers was proven, and whatever appellants' rights might have been if they had not chosen to release

the land from liability to them for the purpose of facilitating its sale, they are now in no position to disaffirm the release. They, by executing the release, evidenced their intention to look solely to the trustee for the distribution of the fund and thereby induced the purchaser to buy and pay for the land, and after the sale they re-affirmed the release by the quit-claim deed to Price. It would be most inequitable now to permit them to disaffirm their release, rescind the sale and subject the land to their claims.

We are of opinion the decree of the circuit court was right, and it is affirmed.

*Decree affirmed.*